**GUTRIDE SAFIER LLP**

Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| THANH TRAN and JYOTINDRA SHAKYA, on behalf of themselves and those similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>FANTASIA TRADING LLC; POWER MOBILE LIFE, LLC<br><br>     Defendants. | Case No. 3:23-cv-03925-JD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR, UNLAWFUL, AND DECEPTIVE TRADE PRACTICES; AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Thanh Tran and Jyotindra Shakaya (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Fantasia Trading LLC and Power Mobile Life, LLC (collectively, "Defendants"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1.      Defendants falsely and deceptively represent that their Eufy-brand security cameras (the "Eufy Cameras") are "1080p," "2K," and "4K" cameras. They are not. Although the cameras have the *pixel count* associated with Defendants' representations, the cameras do not have the requisite *image detail* (aka, optical resolution) that reasonable consumers expect when they see Defendants' advertising. As alleged by Plaintiffs, and supported by their survey evidence, when consumers see security cameras advertised as being "1080p," "2K," and "4K," they reasonably expect not only the correct pixel count, but *also* the corresponding amount of image detail that is associated with the resolution representations. Indeed, *87%* of consumers surveyed stated that they "believe that cameras advertised as having a higher resolution produce more detailed video." If consumers understood Defendants' resolution claims to be merely claims regarding pixel count, consumers would not expect higher resolution cameras to produce more detailed video.

2.      Image detail is an objective aspect of video quality; it can be measured. And in this case, it *was* measured, by Plaintiffs' expert Dr. Castleman. The measurements establish the following:

- The image detail of the "4K" Eufy Cameras, when objectively measured, is *less than 2K*.

- The image detail of the "2K" Eufy Cameras, when objectively measured, is *720p* or less.

At a minimum, a consumer shopping for a 4K security camera reasonably expects that it will provide more image detail than a 2K security camera. Likewise, at a minimum, a consumer shopping for a 2K security camera reasonably expects that it will provide more image detail than a 720p camera. The Eufy Cameras fail to meet these reasonable expectations.

3.    The pixel count of an image or video refers to its format.  Any image or video can be converted to a higher resolution format. An interpretation of Defendants' resolution claims that is based solely on the format of the video that the camera produces is unreasonable because it would render the resolution claim effectively meaningless.

4.    Consumers shopping for security cameras are critically concerned with image detail. In fact, image detail is one of the most important factors—if not the most important factor—that a consumer considers when purchasing a security camera. Security cameras with exceptional detail are desirable because they enable recorded subjects to be identified with greater accuracy and at longer distances. They are also desirable because they are capable of monitoring larger areas without sacrificing detail and definition. A high-resolution security camera should be capable of producing crisp detailed and defined images that enable users to identify subjects by their faces, hair, clothing, tattoos, and other indicia. As a result, security cameras which purport to offer high video and image detail and definition command a higher price than security cameras with low detail and definition.

5.    Defendants are sophisticated and well-established technology companies who market various electronic devices under several brands, know this to be the case, and deliberately advertise, market and sell the Eufy Cameras in a way that deceives consumers into falsely believing that they are capable of providing higher detail and definition than they are capable of. Defendants know that consumers shopping for "1080p," "2K," "4K," "HD," and "UHD" security cameras expect the image detail commensurate with those representations—not just the mere pixel count associated with those representations, and Defendants have designed their marketing for the Eufy Cameras accordingly.

6.    Defendants made the "1080p," "2K," "4K," "HD," and "UHD" video and image claims throughout the Class Period in all of their significant marketing: on the Eufy Cameras product pages (available at https://us.eufy.com/); on their Amazon.com product pages; on the pages and in the advertising material of other third-party retailers; in the Eufy Cameras product specifications; and on the packaging of the Eufy Cameras themselves.

7.    Defendants never disclosed to consumers that the Eufy Cameras fail to offer video and image detail required by the advertised "1080p," "2K," "4K," "HD," and "UHD" representations.

## **PARTIES**

8.    Plaintiff Thanh Tran is, and at all times alleged in this Class Action Complaint was, an individual and a resident of San Jose, California. Mr. Tran intends to remain in San Jose and makes his permanent home there.

9.    Plaintiff Jyotindra Shakya is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Fremont, California. Mr. Shakya intends to remain in Fremont, California and makes his permanent home there.

10.    Defendant Fantasia Trading, LLC ("Fantasia") is a limited liability company existing under the laws of the State of Delaware, having its principal place of business in Ontario, California.

11.    Defendant Power Mobile Life, LLC ("Power Mobile") is a limited liability company existing under the laws of the State of Washington, it has its principal place of business in Bellevue, Washington.

12.    Defendants Fantasia and Power Mobile are jointly responsible for the conduct alleged herein, including without limitation, the false and deceptive labeling, advertising, marketing, and sale of the Eufy Cameras.

13.    Indeed, the smart phone application that is used to operate the Eufy Cameras, Eufy Security, is listed on Apple App Store as belonging to Defendant Power Mobile Life:



14.    Each Quick Start Guide, User Manual, or similar instruction manual for the Eufy Cameras instructs users to download the Eufy Security Application on the Apple App Store or Google Play Store. This application allows consumers to access their purportedly "1080p," "2K," "4K," "HD," "UHD" video and images.

15.    In addition, the S330 eufyCam Quick Start Guide states that Defendant Power Mobile is "the responsible party" for the product's "compliance with FCC regulations."[1] The same is true for the eufyCam 2 Pro User Manual.[2]

16.    At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendant and, in doing the things alleged herein, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

---

[1] Available at
https://ankertechnologycompanyltd.my.salesforce.com/sfc/p/#5g000004DkWQ/a/5g000000gQc
E/xoLbY2dbAGA7.4gcZ0bl2Qq6r0tLLu_0FdyC.ve7Tjs at p. 16 (last accessed March 27, 2024).

[2] Available at
https://ankertechnologycompanyltd.my.salesforce.com/sfc/p/#5g000004DkWQ/a/5g000000g1c
T/XL7xfLIDxAZnf2gxJzoYE7WYU7PxeuB9iDgwItAhyzA at p. 12 (last accessed March 27, 2024).

17.    At all times herein mentioned, each Defendant was a member of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuit of, said joint venture, partnership and common enterprise.

18.    At all times herein mentioned, the acts and omissions of each Defendant concurred and contributed to the various acts and omissions of each Defendant in proximately causing the injuries and damages as herein alleged.

19.    At all times herein mentioned, each Defendant ratified each and every act or omission complained of herein.

20.    At all times herein mentioned, each Defendant aided and abetted the acts and omissions of each Defendant in proximately causing the damages, and other injuries, as herein alleged

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) Plaintiffs and Defendants are citizens of different states.

22.    This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

23.    The injuries, damages, and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendants Fantasia and Power Mobile within, affecting, and emanating from the State of California. Both Defendants regularly conduct and/or solicit business as described herein, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

25.    In accordance with California Civil Code Section 1780(d), Plaintiffs concurrently file herewith a declaration establishing that, at various times throughout the class period, s/he purchased one or more Eufy Cameras while located in California. (*See* Exhibit A.)

26.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**<u>SUBSTANTIVE ALLEGATIONS</u>**

**A.    Video and Image Detail is Critical to Purchasers of Security Cameras.**

27.    In the security camera industry, video and image detail are everything. The higher a camera's detail and definition, the more likely suspects can be identified by their faces, hair, clothing, tattoos, and other indicia—especially as the distance between the camera and the subject increases. Video and image detail often makes the difference between being able to identify a subject, and having a worthless security camera and footage.

28.    Security cameras which boast about "1080p," "2K," "4K," "HD," and/or "UHD" levels of video and image are also capable of monitoring larger areas without sacrificing detail and definition, which translates to fewer cameras needed to effectively oversee a given space.

29.    Defendants understand that consumers seek security cameras with exceptional video and image detail. Indeed, in an interview, Defendants ask a product reviewer: "eufyCam3 is Eufy's first security camera that features 4K resolution. Do you think 4K is important to consumers?" The reviewer responds that it is "vital here" because other security cameras can "barely even tell the license plate in front of your house." He states that "having 4K means you have better zoom, . . . better visual range, and if you need to see someone's face, you have that

ability because you basically have more pixels."[3] In other words, he stated that the as the pixel count increases, image detail correspondingly improves.

B. **Defendants' Eufy Cameras Advertise That They Are Capable of "1080p," "2K," "4K," "HD," "UHD" Levels of Video and Image Detail.**

1. **The Eufy Cameras**

30.    Defendants prominently market the Eufy Cameras as being capable of video and image detail of, variously, "1080p," "2K," "4K," "HD," or "UHD." The following representations accompanied the listed Eufy Cameras advertised on Defendants' website (https://us.eufy.com/)[4]:

| Eufy Camera Model | Advertised Video/Image Detail and Definition |
|---|---|
| 2 | 1080p |
| 2 Pro | 2K |
| 2C | 1080p |
| 2C Pro | 2K |
| S220 and S220 video doorbell | 2K |
| S230 | 2K |
| S330 video doorbell | 2K |
| Video doorbell 2K pro | 2K |
| S330 video smart lock | 2K |
| S100 wall light cam | 2K |
| S120 solar wall light cam | 2K |
| S300 | 4K |
| S330 | 4K |
| S350 | 4K |

The term "Eufy Cameras," as used herein, refers to the above-referenced cameras and any other cameras which purportedly provide "1080p", "2K," "4K," "HD," or "UHD" levels of video and image detail.

---

[3] https://www.youtube.com/watch?v=pqoX_QPQEYs&t=122s at 1:23-1:55 (last accessed Apr. 19, 2024).

[4] Verified on July 22, 2023. This list is not exhaustive and excludes differing model variants, kits, and product bundles Defendants advertise and sell.

**2.    The "S300 eufyCam" (a "4K" Eufy Camera)**

31.    Defendants' prominently feature the detail and definition claims for each Eufy Camera. For example, Defendants prominently advertise the "S300 eufyCam (eufyCam3C)" as capable of providing "4K Detail Day and Night."[5]



32.    Additional statements found under the "Quick Intro" and "Unboxing & Reviews" section of the same page further advertise the S300 as capable of "4K" resolution. The "Specs" and "Features" section of the same page also claims that the S300 is capable of "4K."

33.    The product page on the Eufy Website further claims that the camera is capable of "4K Ultra HD Detail" which allows a user to "see the small details of any person that walks onto your property." It also claims the camera can capture "4K Detail."[6]

---

[5] *See* https://us.eufy.com/products/t8882121?variant=41871155921082 (last accessed July 22, 2023).

[6] These same advertisements are found on the Amazon product page.





34.    Defendants make similar representations wherever it advertises the Eufy Cameras. For example, the S300 product page on Amazon.com represents this Eufy Camera as a "4K Camera" capable of "4K Detail."[7]

35.    Statements found beneath the S300 listing further represent this Eufy Camera is capable of providing "4K Detail Day and Night" and touts that one can "[s]pot tiny features on any potential trespasser (human or animal) with eufyCam 3C—even at night." It further claims the camera has a resolution of "2160p" (another term for "4K"[8]).

---

[7] *See* https://www.amazon.com/eufy-security-Expandable-Recognition-Spotlight/dp/B0B87RYGJ7?th=1 (last accessed Apr. 19, 2024).

[8] *See* https://en.wikipedia.org/wiki/4K_resolution at "2160p resolution" (last accessed July 23, 2023).

36.    Based on these representations, consumers reasonably believe that when they use a S300, and other purportedly "4K" Eufy Cameras similarly advertised, they will be able to view video and image detail concomitant with the 4K representations.

37.    *At a minimum*, consumers expect, when they purchase a camera advertised as "4K," "4K Detail," and "UHD" that it will offer *more* detail and definition than a 2K camera, which costs less. However, as confirmed by expert testing below, the "4K" Eufy Cameras offer *less* detail and definition than a 2K camera.

### 3.    The "Video Doorbell Dual" (a "2K" Eufy Camera)

38.    Defendants advertise each of its "2K" Eufy Cameras similarly, prominently featuring representations concerning their purported detail and definition. For example, the "Video Doorbell Dual," a kit configuration consisting of the "S330 Video Doorbell" and "S230 SoloCam," purports to be capable of capturing "every event that occurs around your home in ultra-clear 2K resolution"[9]:



---

[9] *See* https://us.eufy.com/products/bundle-e8213181-1-t81241w1-2?_pos=9&_sid=f35aa128c&_ss=r, accessed 7/23/2023

39.     Individually, the S330 Video Doorbell is presented as a "2K" camera that allows purchasers to "see 2K Ultra-HD details"[10]:



40.     The specifications also assert that the S330 Video Doorbell is capable of "2K" video in one of the two "dual" cameras found on the device.

41.     The Amazon listing makes similar representations regarding the camera's capability to capture video in 2K detail. It similarly claims that the S330 Video Doorbell is capable of "2K HD" and allows users to "See 2K Ultra-HD Details."[11]

42.     Similarly, the "S230 SoloCam" product page touts that this camera is capable of video of "2K" in multiple places on the Eufy website including the product pages which states that "The Key is in the Detail: Capture every event that occurs around your home in ultra-clear 2K resolution."[12]

---

[10] *See* https://us.eufy.com/products/t8213181?_pos=4&_sid=29a6b81cf&_ss=r (last accessed July 23, 2023).

[11] *See* https://a.co/d/fM5EFWF (last accessed July 23, 2023).

[12] *See* https://us.eufy.com/products/t81241w1?_pos=1&_sid=6ca9dc3e8&_ss=r (last accessed July 23, 2023).

43.    The S230 SoloCam is further advertised on the Eufy website, like many other purportedly "2K" Eufy Cameras, as capable of "Captur[ing] Every Detail" and offering "Clarity" and "crisp 2K high-definition video"[13]:



44.    A "Product Comparison" found on the same page purports to compare the S230 SoloCam with other Eufy Cameras, all which purport to offer resolution above "1080p":

| | SoloCam S40 | SoloCam L20 | SoloCam E40 | SoloCam E20 |
|---|---|---|---|---|
| MSRP | $199.99 | $149.99 | $129.99 | $99.99 |
| Resolution | 2K | 1080p | 2K | 1080p |

---

[13] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD

45.     Based on these representations, consumers reasonably believe that when they use the S230 SoloCam, and other purportedly "2K" Eufy Cameras similarly advertised, they will be able to view video and image detail concomitant with the 2K representations.

46.     *At a minimum*, consumers expect, when they purchase a camera advertised as "2K," that it will offer far *more* detail and definition than a 720p camera, which costs much less. However, as confirmed by expert testing below, the "2K" Eufy Cameras offer *less* detail and definition than 720p cameras.

### 4.    The "S200 eufyCam" (a "1080p" Eufy Camera)

47.     Defendants represent that all of its Eufy Cameras are capable of *at least* 1080p. The "S200 eufyCam," for example, represents that it is capable of "Live-stream[ing] and record[ing] footage in crystal clear 1080p HD" and allows users to "[v]iew recordings or live footage in crisp clarity, even at night, for a clear view of who's there." Defendants understand that reasonable consumers equate 1080p to refer to video and image detail because the listing purports to contrast this Eufy Camera with a purportedly inferior 720p camera[14]:



---

14 *See* https://us.eufy.com/products/bundle-e8213181-1-t81241w1-2?_pos=9&_sid=f35aa128c&_ss=r, last accessed 7/23/2023

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD

48.    Based on these representations, consumers reasonably believe that when they use a S200 eufyCam, and other purportedly "1080p" Eufy Cameras similarly advertised, they will be able to view video and image detail concomitant with the 1080p representation.

49.    At a minimum, consumers expect, when they purchase a camera advertised as "1080p," that it will offer far more detail and definition than a 720p camera, which costs much less.

### 5.    Other Eufy Cameras

50.    Defendants advertise, market, and sell a variety of other Eufy-brand cameras, which all falsely claim they are capable of providing superior levels of video and image detail and definition of, variously, "1080p", "2K," "4K," "HD," or "UHD."

51.    For example, in an advertisement for the S350, Defendants claim the security camera is capable of "4K" / "UHD" and of providing images that are "wider," "closer," and "clearer," while simultaneously zooming in from afar to show the tiny fine print on a box of chocolates.[15]

52.    Defendants claim that the eufy S220 is capable of producing an "Image" of "Quality sharp 2K video."[16] The eufyCam 2 Pro is represented to provide "2K Resolution" and "Crystal Clear Video, Day & Night."[17] Defendants further represent the eufy Video Doorbell E340 camera as capable of providing "2K HD Clarity" "even in the night."[18]

53.    Defendants have sold these Eufy-brand cameras in a variety of different sets, packages, kits, and variants, such as packages that include multiple cameras, solar panel charging units, digital video storage devices, or other products. The "1080p", "2K," "4K," "HD," and "UHD" representations with respect to these other Eufy-brand cameras are identical

---

[15] https://www.youtube.com/watch?v=7WZ6jijRaak at 0:07-0:12 (last accessed Apr. 19, 2024).

[16] https://www.eufy.com/blogs/security-camera/best-indoor-camera-for-elderly (last accessed Apr. 19, 2024).

[17] https://www.youtube.com/watch?v=PZR2Ss9qemE at 0:21 (last accessed Apr. 19, 2024).

[18] https://www.youtube.com/watch?v=OY09RhABNXM at 0:42 (last accessed Apr. 19, 2024).

to the representations Defendants make with respect to the Eufy Cameras specifically described herein.

54.    Based on Defendants' representations with respect to each and every Eufy Camera, consumers reasonably believe that they will receive a security camera which is capable of video and image detail and definition concomitant with the represented "1080p", "2K," "4K," "HD," or "UHD" level.

**C.    Third-Party Retailers**

55.    On information and belief, Defendants are the primary retailer of Eufy Cameras—advertising, marketing, and selling the cameras through the Eufy website. The Eufy Cameras are also sold on other websites and through brick-and-mortar stores like Best Buy and Home Depot. Defendants provide these third-party retailers with specifications and advertising materials representing that the Eufy Cameras are capable of "1080p", "2K," "4K," "HD," or "UHD" *See, e.g.*, https://www.homedepot.com/p/eufy-Security-SoloCam-S40-Wireless-Home-Security-Outdoor-Surveillance-Spotlight-Camera-2K-HD-T81241W1/318410424 (stating that the Eufy Camera provides "2K HD" video resolution).

56.    Because Defendants provide these false, deceptive, and inaccurate specifications and advertising material to every retailer who sells the Eufy Cameras, any consumer who purchases a Eufy Camera reasonably believes, based on Defendants' representations, that the Eufy Cameras are capable of video and image detail and definition at "1080p", "2K," "4K," "HD," or "UHD" levels.

**D.    Plaintiffs' Survey Evidence Confirms That Consumers Who See Security Cameras Advertised as Having a Specific Resolution Expect a Corresponding Increase in Image Detail.**

57.    Plaintiffs engaged a survey expert to design a consumer survey to test how reasonable consumers interpret detail and definition claims such as "1080p", "2K," "4K," "HD," or "UHD." The survey confirmed that consumers expect clearer images and improved detailed from cameras with a higher advertised resolution.

58.    Plaintiffs surveyed 640 consumers in the United States. Respondents were shown the Eufy advertisement below and instructed to look at the advertisements as if they were shopping for a home security camera as they normally would (either online or in-store). The survey allowed respondents to look at the advertisement for as long as they needed.



59.    Respondents were asked, "Do you believe that the claim '2K' appearing in the advertising that you just reviewed refers to the resolution of the camera, or do you not believe that?" *88%* said they "believe that '2K' is about resolution" and 12% said they "do not believe that."

60.    Respondents were asked, "Do you believe that cameras advertised with a higher resolution produce clearer video than cameras advertised as having a lower resolution, or do you not believe that?" *90%* said they "believe that cameras advertised as having a higher resolution produce clearer video" and 10% said they "do not believe that."

61.    Respondents were asked, "Do you believe that cameras advertised as having a higher resolution produce video with a higher level of detail than cameras advertised as having a lower resolution, or do you not believe that?" *87%* said they "believe that cameras advertised as

having a higher resolution produce more detailed video" and 13% said they "do not believe that."

62.    Respondents were asked, "Do you believe that you would be better able to recognize faces in video from cameras advertised as having a higher resolution than cameras advertised as having a lower resolution, or do you not believe that?" 89% said they "believe I would better be able to recognize faces in video from cameras advertised as having a higher resolution" and 11% said they "do not believe that."

63.    Plaintiffs' expert also conducted a separate comparative survey involving the claim "1080p."

64.    The second survey polled 790 consumers of home security cameras. Respondents were shown two home security camera advertisements and instructed to look at the advertisements as if they were shopping for a home security camera as they normally would (either online or in-store). The survey allowed respondents to look at the advertisements for as long as they needed.

**[SPACE INTENTIONALLY LEFT BLANK]**

65.    Respondents were presented with the following two security camera advertisements with all branding removed:

    a.    Camera A:



Compact indoor plug-in smart security camera, 1080p HD video, night vision, motion detection, two-way audio, easy set up, Works with Alexa - 1 camera (White)

    b.    Camera B:



Compact indoor plug-in smart security camera, 720p HD video, night vision, motion detection, two-way audio, easy set up, Works with Alexa - 1 camera (White)

66.    The only difference between Camera A and B were the representations regarding detail and definition.

67.    To assess consumer understanding about video and image detail claims, respondents were asked whether they believed Camera A would provide clearer pictures and video, whether Camera B would give clearer pictures and video, or whether both cameras provide pictures and video of the same detail and definition. Respondents overwhelmingly (82%) believed that the 1080p security camera would provide clearer pictures and videos. In other words, reasonable

consumers expect greater detail and definition from a 1080p security camera when compared to a 720p security camera.

68.     To further assess consumer understanding of the video and image detail claims, respondents were asked whether it would be easier to identify people's faces using Camera A, Camera B, or whether both would be equally easy to identify faces with. Respondents overwhelmingly (76%) believed that it would be easier to identify faces using the 1080p security camera. That is, reasonable consumers shopping for security cameras would purchase a 1080p camera expecting superior levels of video and image detail when compared to a 720p camera.

69.     To assess consumer understanding about resolution, respondents were asked whether they believed Camera A would have a higher resolution, Camera B would have a higher resolution, or whether the cameras would have the same resolution. Respondents overwhelmingly (85%) believed that the 1080p security camera would have a higher resolution. That is, with each step up in advertised detail and definition, reasonable consumers expect a corresponding increase in resolution.

70.     The survey results demonstrate that reasonable consumers understand that with each step up in resolution, they expect a corresponding increase in detail and definition. That is, reasonable consumers do not expect a security camera advertised as 1080p to provide less video and image detail than a 720p camera. Consumers also do not expect a security camera advertised at "2K" to provide the same video and image detail of a 1080p camera, or a security camera advertised as "4K" / "UHD" to provide the same video and image detail of a 2K camera.

71.     The survey further demonstrates that reasonable consumers do not equate Defendants' detail and definition claims as relating to pixels because pixels alone do not determine video and image detail. Reasonable consumers equate "1080p", "2K," "4K," "HD," or "UHD" claims as relating to the overall video and image detail and definition.

72.     Indeed, Defendants' own product listing for the S200 eufyCam (*see supra* ¶ 45) confirms this understanding. It purports to contrast a 1080p and a 720p image to show consumers the purported superiority of the 1080p camera. The product listing shows a clearly inferior 720p image with poor detail and definition. Thus, Defendants understand that consumers equate "1080p", "2K," "4K," "HD," or "UHD" claims to higher video and image detail.

**E.    Expert Testing Demonstrates the Eufy Cameras Do Not Produce Detail and Definition at "1080p," "HD," "2K," "4K," and "UHD" Levels.**

73.     Despite Defendants' advertising, the Eufy Cameras are not capable of providing the advertised detail and definition which consumers reasonably expect to receive when purchasing a Eufy Camera. Defendants' "1080p", "2K," "4K," "HD," or "UHD" representations are false and misleading, as evidenced by quantitative expert analysis and comparisons of the Eufy Cameras' with real 1080p/HD, 2K, and 4K/UHD cameras.

**1.    Expert Testing Shows that Defendants' Representations Are False and Misleading.**

74.     To test the Eufy Cameras' capabilities, Plaintiffs retained an expert in video image processing, Dr. Kenneth R. Castleman. Dr. Castleman was an Adjunct Professor of Biomedical Engineering at the University of Texas at Austin from 2000 until 2010. He also held executive and senior technical positions at several high-technology companies from 1970 until 2007. He was a Senior Scientist at NASA's Jet Propulsion Laboratory from 1970 until 1985, working in the Image Processing Laboratory of JPL. He also worked as a research fellow at the University of California Los Angeles from 1981 until 1985, and was a lecturer at the California Institute of Technology from 1975 until 1977, where he taught courses in digital image processing. All of his work in academia and in the business sector has involved electronics, optics, and computer programming.

75.     Dr. Castleman obtained and tested the Eufy Cameras as part of his work in this matter, including the E340 Video Doorbell camera (advertised as "2K"), and the S300 eufyCam

3C (advertised as "4K"). After configuring the Eufy Cameras to achieve their maximum

resolution, Dr. Castleman compared their images to that of three reference cameras: (i) the

Nikon B600, which is capable of 3456 x 4608 resolution; (ii) the iPhone 6s Plus, which is

capable of 3024 x 4032 resolution; and (iii) the Axis P3905-R Mk II network camera, which is

capable of 1920 x 1080 resolution. Dr. Castleman adjusted the settings of the reference

cameras' video resolution according to which Eufy Cameras he compared them against, to

ensure an apples-to-apples comparison.

76.    Dr. Castleman's evaluated the video and image detail claims of the Eufy cameras

using various methods. Dr. Castleman controlled for other parameters which can affect detail

and definition, such as image noise, color, and lens distortion.

77.    One of the methods Dr. Castleman used to test the Eufy Cameras was to generate the

Modulation Transfer Function ("MTF") for each camera. The MTF measures the optical

resolution of the camera which allows for more accurate testing of the video and image detail

because it measures resolution, sensor quality, processing algorithms, electronic circuitry, and

lens quality. These are the primary factors which determine the outputted video and image

detail and definition.

78.    As objects in a video scene become smaller, their contrast is reduced until they

eventually disappear. Cameras with higher resolutions should be able to reproduce smaller

objects with good contrast, compared to cameras with lower resolutions. The MTF is a plot of

the contrast of objects versus size, and is commonly used to illustrate the optical resolution of

an imaging system. Typically, the objects are alternating black and white vertical bars of

different width and spacing. The size of the bars is specified by their frequency in line pairs

(i.e., one black bar and one adjacent white bar) per unit of length.

79.    For camera analysis, the MTF is plotted from zero to 0.5 line pairs per pixel. The

MTF can be calculated from the image of a test target containing bar patterns of various sizes,

but it can also be computed from the image of an edge. The following figure shows an ideal

edge, its profile, and its corresponding MTF:

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD



**Figure 1. An ideal edge, its profile, and its MTF.**

80.    In Figure 1, the image of the black/white transition edge is shown at the top. The graph in the lower-left corner of the Figure shows the profile of the edge as a plot of the brightness across the edge. The MTF graph appears at the lower-right corner of the Figure.

81.    In Figure 1, the edge rises from 10% to 90% of the way from black to white in the space of 0.88 pixels. The MTF always starts at 1.0 at zero frequency. This MTF falls off from 100% at zero to about 65% at the maximum resolvable frequency of 0.5 cycles per pixel. This is the best possible MTF for an edge in a digital image it exhibits no degradation from a lens, image processing, or anything else. The closer a camera can come to this MTF, the better its optical resolution.

82.    To generate the MTFs for the reference cameras and Eufy Cameras, Dr. Castleman took test video from each of the cameras. The test video included a page of text, placed at ten feet from the cameras. Sample frames from the test video, after adjusting appropriately for differential image size, are depicted below:

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD



Images taken at ten feet under dual 45 degree side lighting.

**Figure 2. Eufy Cameras versus reference cameras, 10 feet.**

83.    The images in Figure 2 show that, even to the naked eye, the detail and definition of the Eufy Cameras is clearly inferior to that of the reference cameras. In the images captured by the reference cameras, the text is crisp, and at least the first few lines are readable. In contrast, in the images captured by the Eufy Cameras, most or all of even the largest text is unreadable.

84.    Comparing the MTFs and edge responses of the reference cameras to those of the Eufy Cameras quantitatively confirms that the video and image detail of the Eufy Cameras is inferior. Figure 3 shows MTFs for the iPhone 6 Max and Nikon B600 reference cameras, which are generally representative of the MTFs for the reference cameras considered:

**Figure 3. Representative MTFs for the reference cameras**

85.     Figure 3 shows the edge responses and MTFs of the two reference cameras. The two reference cameras produce similar values for 10 – 90% rise, overshoot, and undershoot. The MTFs of the two reference cameras are similar, with both having slight overshoot and almost no undershoot.

86.     "Overshoot" occurs when the transition at an edge in the image is reproduced with a higher amplitude than in the original scene. It appears as a bright line or halo on the lighter side of the edge and a dark line on the darker side. Overshoot happens because the imaging system boosts the contrast more than necessary, often due to the signal processing algorithms used to enhance sharpness or due to the inherent characteristics of the imaging sensor and lens. This can lead to an artificial appearance or exaggerated edges in the image. "Undershoot" is the opposite effect. It happens when the transition at an edge is reproduced with a lower amplitude than the original. Undershoot may manifest as a dimming or softening of the edge, where the contrast is lower than it should be. This often occurs due to limitations in the imaging system's ability to resolve fine details, or due to signal processing algorithms that inadvertently reduce contrast in an attempt to suppress noise or other artifacts. They each compare favorably to the MTF of the ideal edge in Figure 1.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD

87.    Figure 4 shows the edge responses and MTFs of the three Eufy Cameras. The MTFs have sharp edges, as reflected by the small 10-90% rise distances, but extreme amounts of overshoot and undershoot. Further, the MTFs go well above 2.0, indicating extreme amounts of edge enhancement, likely caused by the Eufy Cameras' image processing.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD



**Figure 4. MTFs for Eufy Cameras**

88.    A side-by-side comparison of all four cameras' MTFs and edge responses is revealing:



**Figure 5. Edge responses and MTFs**

89.    Figure 5 shows that the two reference cameras have superior MTFs with little

overshoot and almost no undershoot. The Eufy Cameras' MTFs, however, show large amounts

of boost at medium frequencies, due undoubtedly to extreme edge enhancement processing in

the camera circuitry. This produces large amounts of overshoot and undershoot, which adds

artifacts to the images in regions of varying brightness. The MTFs confirm what is already apparent in the images of Figure 2: the video and image detail of the Eufy Cameras is markedly inferior to those of the reference cameras in a fair comparison.

90.    Dr. Castleman performed further testing on the cameras, by preparing another set of images for comparison. These images were made by cropping out a 24" x 36" test target from test camera images taken at 10 feet with dual 45-degree side lighting, and scaling the reference image to the same size as the corresponding Eufy Camera image. Then the type size of the smallest readable line was selected in both images. The ratio of type size in the test image to the type size in the reference camera image, multiplied by 4,000 (4K resolution) was used to estimate the resolution of the test camera.

91.    The test target contains printed text in sizes ranging from 0.20" to 1.44" in height. The upper section of the text chart is a 200% enlargement of the lower section, and the actual text height is twice the indicated value.

92.    The text target image from the S300 eufyCam 3C camera is shown below. It is 622 x 413 pixels, with a pixel density of 17.28 ppi:



**Figure 6. Comparison of the S300 eufyCam 3C to a scaled image from the iPhone 12.**

93.    In Figure 6, the readability of the image obtained by the iPhone 12 reference camera (i.e., the image on the right) goes down to approximately 0.32", or somewhere between 0.28" and 0.36". For S300 eufyCam 3C (i.e., the image on the left), readability goes down to only about 0.72". The ratio is 44%. Dr. Castleman's testing demonstrates that *the true resolution of the eufyCam 3C—advertised as being 4K camera—is 0.44 x 4,032 = 1,774, or slightly less than 2K resolution.*

**Figure 7. Comparison of the Eufy Video Doorbell E340's Telephoto Camera to the iPhone 12.**

94.    Figure 7 shows a comparison of video from the Eufy Video Doorbell E340's telephoto camera against video captured by the iPhone 12 reference camera. In the video captured by the iPhone, the 0.48" line is readable. In the Eufy Video Doorbell E340 telephoto camera image, even the 0.72" line is unreadable.[19] At this low pixel density, artifacts introduced by the extreme edge enhancement processing distort the text badly.

---

[19] To ensure an accurate comparison between the images captured by the two cameras in Figure 7, the image obtained by the Eufy Video Doorbell E340's telephoto camera was scaled down appropriately.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-cv-03925-JD

95.    Dr. Castleman concluded that—contrary to Defendants' advertising—the tested Eufy Cameras are capable of the following resolution:

| Eufy Camera | Advertised Resolution | Actual Resolution |
|---|---|---|
| S300 eufyCam 3C | 4K/UHD | Less than 2K (approximately 1,774) |
| Video Doorbell E340 (telephoto camera) | 2K | 720p or less |

**2.    Qualitative Testing by Plaintiffs' Counsel Further Shows that Defendants' Representations are False and Misleading.**

96.    Dr. Castleman's conclusions confirmed prior testing performed by Plaintiffs' counsel. To test the Eufy Cameras' capabilities, Plaintiffs' counsel took a video of a subject at distances of ten feet and twenty feet. The S300 eufyCam 3C camera (the "Test Eufy Camera") was chosen for the test because it is currently offered for sale and purports to a "4K" camera. The Test Eufy Camera was set to optimal settings and connected to a fast Wi-Fi connection. The video subject was an individual holding a hardcover book with text in various font sizes. One video clip was taken using the Test Eufy Camera, and the other clip was taken using a true 4K camera. After the video was taken, a still image from each camera's video output was cropped to focus on the subject's face and book cover:





| Test Eufy Camera at 10 ft | True 4K Camera at 10 ft |
|---|---|

97.     As the images above show, the image taken by the Test Eufy Camera at only ten feet has an image detail that is noticeably inferior to that of the True 4K camera. For example, the level of detail in the jacket stitching, houseplant leaf, jacket logo, and book cover is markedly lower in the Test Eufy Camera. In contrast, the image taken by the true 4K camera is far sharper—the subject can be easily identified; the stitching in the jacket is much more distinct; the veins and definition in the houseplant leaf can be seen; the jacket logo appears distinctly rather than as a blur; and much more detail emerges in the book cover.[20]

98.     At 20 feet, the differences are even more stark:

---

[20] The images in this brief are best viewed in PDF format on a computer screen. Printing this brief may cause loss in image quality, depending on the printer used.





| Test Eufy Camera at 20 ft | True 4K Camera at 20 ft |
|---|---|

99.    At twenty feet, the image produced by the Test Eufy Camera has lost nearly all facial features. In comparison, the true 4K image is clear enough that one may still be able to identify the subject. Additionally, the true 4K image preserves other details, including the stitching in the subject's jacket, and the shape of the jacket logo. In fact, in the image captured by the Test Eufy Camera, the jacket's stitching has all but disappeared, whereas the stitching can readily be seen in the image captured by the true 4K camera. Finally, the title of the book can much more readily be discerned in the true 4K image, whereas it is completely illegible in the image captured by the Test Eufy Camera.

**F.  Plaintiffs' Experiences**

**1.    Thanh Tran**

100.  In July 2022, while residing in San Jose, California, Plaintiff Thanh Tran was shopping for security cameras. He was specifically looking for security cameras that had the highest detail and definition as possible while still being within his budget. Seeking cameras with superior video and image detail was important to him because he understood that subjects can be more easily identified

101.   During his shopping process, he visited Amazon and located the Eufy security Video Doorbell Dual Camera with HomeBase. He read the entire Amazon listings for this product, including the various representations that the telephoto camera was "2K" (*see supra*, Section B). He also saw that the camera was within his budget.

102.   Based on the representations he saw on Amazon, Mr. Tran purchased the camera, at the listed price.

103.   After he installed and used the camera, Mr. Tran was disappointed in the video and image detail because he expected far superior detail and definition based on the various "2K" representations. He believed, based on the "2K" representations that he read, that the video and image detail would have been substantially clearer than the video he got from the camera. At minimum, when purchasing the "2K" camera, he did not expect to receive a camera that was only capable of producing 720p video and image detail.

104.   Had Mr. Tran known before his initial purchase that the Eufy Cameras were not capable of providing "2K" detail and definition he would not have purchased the camera or, at a minimum, he would have paid less for it.

### 2.    Jyotindra Shakya

105.   In November 2022, while residing in Fremont, California, Plaintiff Jyotindra Shakya was shopping for security cameras. He was specifically looking for security cameras that had the highest detail and definition as possible while still being within his budget. Seeking cameras with superior video and image detail was important to him because he understood that subjects can be more easily identified.

106.   During his shopping process, Mr. Shakya visited the Eufy website at https://us.eufy.com,[21] and located the S300 eufyCam (eufyCam 3C)—the same camera used in the comparison test described above. He read the entire listing on the Eufy website—including the

---

[21] The June 13, 2023 Terms of Service on the Eufy website contain an arbitration provision purporting to require arbitration in Shenzhen, China. Defendants added that provision to the website long after Mr. Shakya made his purchase. No Plaintiff has ever agreed to any arbitration provision with respect to their purchase or use of the Eufy Cameras.

various representations that the camera was "4K" (*see supra*, Section B). He also saw that the camera was within his budget.

107.   Based on the representations he saw on the Eufy website, Mr. Shkaya purchased the S300 eufyCam (eufyCam 3C), for $363.80.

108.   After he installed and used the camera, Mr. Shakya was disappointed in the video and image detail because he expected far superior detail and definition based on the various "4K" and "4K Detail" representations. He believed, based on the "4K" representations that he read, that the video and image detail and definition would have been substantially clearer than the video and images he got from the camera. At minimum, when purchasing the "4K" camera, he did not expect to receive a camera that was only capable of producing 2K video and image detail.

109.   Had Mr. Shakya known before his initial purchase that the Eufy Cameras were not capable of providing "4K" detail and definition he would not have purchased the camera or, at a minimum, he would have paid less for it.

## CLASS ALLEGATIONS

110.   In addition to their individual claims, Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class and subclass of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

111.   Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

The "Class": All natural persons who purchased Eufy Cameras in the United States within the four years preceding the filing of this Complaint (the "Class Period").

The "California Subclass": All Class Members who purchased Eufy Cameras in California.

112.   This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

113.   Numerosity: Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

114.   Common Questions Predominate: This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful, misleading, unfair, and/or false statements and omissions that led them to believe that the Eufy Cameras were, variously, capable of providing detail and definition commensurate with the "1080p", "2K," "4K," "HD," and/or "UHD" representations, when they were not. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

     a.  whether the Eufy Cameras are capable of providing detail and definition commensurate with the represented "1080p", "2K," "4K," "HD," and/or "UHD";

     b.  whether the Eufy Cameras can record detail and definition that is commensurate with the represented "1080p", "2K," "4K," "HD," and/or "UHD";

     c.  whether users can view "1080p", "2K," "4K," "HD," and/or "UHD" video from the Eufy Cameras on users' devices, as advertised;

     d.  whether Defendants unfairly, unlawfully, and/or deceptively misrepresented that the Eufy Cameras are capable of providing "1080p", "2K," "4K," "HD," and/or "UHD" detail and definition; that they can record "1080p", "2K," "4K," "HD," and/or "UHD" video; and that users can view "1080p", "2K," "4K," "HD," and/or "UHD" video from the Eufy Cameras on users' devices;

     e.  whether the use of the terms "1080p", "2K," "4K," "HD," and/or "UHD" in Defendants' marketing violated Federal and/or California state law;

f.   whether the advertising of the Eufy Cameras as being capable of "1080p", "2K," "4K," "HD," and/or "UHD" caused them to command a premium in the market as compared with similar products that do not make such a claim;

g.   whether Defendants' advertising and marketing regarding the Eufy Cameras sold to the class members was likely to deceive the class members and/or was unfair;

h.   whether a "1080p", "2K," "4K," "HD," and/or "UHD" claim on product advertising is material to a reasonable consumer;

i.   whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

j.   the amount of profits and revenues earned by Defendants as a result of the conduct;

k.   whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and,

l.   whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

115.   Typicality: Plaintiffs' claims are typical of the claims of other members of the Class because, among other things, all such claims arise out of the same unlawful course of conduct in which Defendants engaged in. Plaintiffs and those similarly situated purchased the Eufy Cameras in reliance on Defendants' misrepresentations and omissions that Eufy Cameras are, variously, "1080p", "2K," "4K," "HD," and/or "UHD" cameras, capable of providing "1080p," "2K," "4K," "HD," and/or "UHD" levels of detail and definition. Thus, they and the class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each class member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

116.   Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

117.   Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

118.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §§ 1750, et seq.)**
**(On Behalf of Plaintiffs and the California Subclass)**

119.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

120.   Defendants' actions, representations, and conduct have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

121.   Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

122.   The Eufy Cameras that Plaintiffs (and other similarly situated class members) purchased from Defendants constitute "goods" within the meaning of California Civil Code § 1761(a).

123.   Defendants' acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Eufy Cameras are capable of providing, variously, "1080p", "2K," "4K," "HD," and/or "UHD"; that the Eufy Cameras could record video in, variously, "1080p", "2K," "4K," "HD," and/or "UHD"; and that users could view, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video recorded by the Eufy Cameras on users' devices. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendants have violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA.

124.   In violation of California Civil Code § 1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code § 1770(a)(7), Defendants' acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code § 1770(a)(8), Defendants' have disparaged

the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code § 1770(a)(9), Defendants' have advertised goods or services with intent not to sell them as advertised. Finally, regarding California Civil Code § 1770(a)(8), Defendants' falsely or deceptively marketed and advertised that the Eufy Cameras are capable of, variously, "1080p", "2K," "4K," "HD," and/or "UHD" detail and definition, when they are not.

125.   Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Class will continue to suffer harm.

126.   CIVIL CODE § 1782 NOTICE. Plaintiffs notice and demand that, within thirty (30) days from that date of the filing of this Complaint, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and or deceptive practices complained of herein.

127.   Should the violations herein alleged not be corrected or rectified as required by Civil Code § 1782 within 30 days with respect to all Class Members, Plaintiffs will seek to amend this Class Action Complaint to seek, on behalf of each Class Member, actual damages of at least $1,000, punitive damages, an award of $5,000 for each Class Member who is a disabled person or senior citizen, and restitution of any ill-gotten gains due to Defendants' acts and practices.

128.   Plaintiffs also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## Second Cause of Action
### False Advertising, Business and Professions Code §§ 17500, *et seq*. ("FAL")
### (On Behalf of Plaintiffs and the California Subclass)

129.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

130.   Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive, and/or misleading statements in connection with the advertising and marketing of the Eufy Cameras.

131.   Defendants' made representations and statements (by omission and commission) that led reasonable customers to believe (i) that the Eufy Cameras are capable of providing, variously, "1080p", "2K," "4K," "HD," and/or "UHD" detail and definition; (ii) that the Eufy Cameras could record, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video; (iii) that users could view, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video recorded by the Eufy Cameras on users' devices.

132.   Plaintiffs and those similarly situated relied to their detriment on Defendants' false, misleading, and deceptive advertising and marketing practices, including, without limitation, each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing the Eufy Cameras, or paying less for them.

133.   Defendants' acts and omissions are likely to deceive the general public.

134.   Defendants engaged in these false, misleading, and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by §§ 17500, *et seq*. of the California Business and Professions Code.

135.   These practices, which Defendants used, and continues to use, to its significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

136.   As a direct and proximate result of such actions, Plaintiffs and the other Class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive, and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

137.   Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from them, the general public, or those similarly situated by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest thereon.

138.   Plaintiffs seek on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

139.   Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class may be unable to obtain monetary, declaratory, and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiffs and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendants acted in good faith.

140. Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

141. Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants' will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which it is not entitled. Plaintiffs, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### Third Cause of Action
**Common Law Fraud, Deceit, and/or Misrepresentation**
**(On Behalf of Plaintiffs and the Class)**

142. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

143. Continuously throughout the last four years Defendants fraudulently and deceptively represented to Plaintiffs and those similarly situated that (i) the Eufy Cameras are capable of providing, variously, "1080p", "2K," "4K," "HD," and/or "UHD" detail and definition; (ii) that the Eufy Cameras could record, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video; (iii) that users could view, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video recorded by the Eufy Cameras on users' devices. Further, continuously over the last four years, Defendants failed to inform Plaintiffs that the detail and definition provided by the Eufy Cameras is less than, variously, "1080p", "2K," "4K," "HD," and/or "UHD"

144. These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiffs, and material at the time they

were made. Defendants knew the true capabilities of the Eufy Cameras, and they knew that the Eufy Cameras were not capable of providing, variously, "1080p", "2K," "4K," "HD," and/or "UHD" detail and definition; that consumers could not record, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video using the Eufy Cameras; and that consumers could not view, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video recorded by the Eufy Cameras on users' devices. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Eufy Cameras. In misleading Plaintiffs and not so informing them, Defendants breached its duty to them. Defendants also gained financially from, and as a result of, its breach.

145.  Plaintiffs and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions. Had they and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Eufy Cameras, or (ii) paying less for the Eufy Cameras.

146.  By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced them and those similarly situated to, without limitation, purchase the Eufy Cameras, including the price premium they paid for the false representations described herein.

147.  Plaintiffs and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

148.  As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Eufy Cameras.

149.  Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that its conduct would cause loss and harm to Plaintiffs and those similarly situated.

1
2

**Fourth Cause of Action**
**Unlawful, unfair, and fraudulent trade practices violation of the Business and Professions**
**Code §§ 17200,** *et seq.*
**(On Behalf of Plaintiffs and the California Subclass)**

3

150. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

4
5

151. Within four (4) years preceding the filing of this lawsuit, and at all times mentioned

6

herein, Defendants have engaged, and continues to engage, in unlawful, unfair, and fraudulent

7

trade practices in California by engaging in the unlawful, unfair, and fraudulent business

practices outlined in this Complaint.

8
9

152. In particular, Defendants have engaged, and continues to engage, in unlawful

10

practices by, without limitation, violating the following state and federal laws: (i) the CLRA as

described herein; and (ii) the FAL as described herein.

11
12

153. In particular, Defendants have engaged, and continues to engage, in unfair and

13

fraudulent practices by, without limitation, the following: (i) misrepresenting in their marketing

14

that the Eufy Cameras are capable of providing, variously, "1080p", "2K," "4K," "HD," and/or

15

"UHD" detail and definition; (ii) misrepresenting in their marketing that the Eufy Cameras

16

could record, variously, "1080p", "2K," "4K," "HD," and/or "UHD" video; (iii)

17

misrepresenting in their marketing that users could view, variously, "1080p", "2K," "4K,"

18

"HD," and/or "UHD" video recorded by the Eufy Cameras on users' devices; and (iv) failing to

19

inform Plaintiffs, and those similarly situated, that the representations stated in (i), (ii), and (iii)

above are false.

20
21

154. Plaintiffs and those similarly situated relied to their detriment on Defendants'

22

unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated

23

been adequately informed and not deceived by Defendants, they would have acted differently

24

by, without limitation: (i) declining to purchase Eufy Cameras, or (ii) paying less for Eufy

Cameras.

25

155. Defendants' acts and omissions are likely to deceive the general public.

26
27
28

156. Defendants engaged in these deceptive and unlawful practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by §§ 17200, *et seq*. of the California Business and Professions Code.

157. These practices, which Defendants uses to its significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

158. As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered and continue to suffer injury in fact and have lost money and/or property in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the amount they paid for the Eufy Cameras and/or the price premium they paid for the Eufy Cameras based on Defendants' false representations.

159. As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

160. Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including the restitution for the premium and/or full price that they or others paid to Defendants as a result of Defendants' conduct. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v*

*Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiffs and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendants acted in good faith.

161.  Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

162.  Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled. Plaintiffs and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**Fifth Cause of Action**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

163.  Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

164.  Plaintiffs and members of the Class conferred a benefit on Defendants by purchasing the Eufy Cameras.

165.  Defendants have been unjustly enriched in retaining the revenues from Plaintiffs' and Class members' purchases of the Eufy Cameras, which retention is unjust and inequitable,

because Defendants (i) misrepresented in their marketing that the Eufy Cameras are capable of providing, variously, "1080p", "2K," "4K," "HD," and/or "UHD" detail and definition; (ii) misrepresented in their marketing that the Eufy Cameras could record, variously, "1080p," "2K," "4K," "HD," and/or "UHD" video; (iii) misrepresented in their marketing that users could view, variously, "1080p," "2K," "4K," "HD," and/or "UHD" video recorded by the Eufy Cameras on users' devices; and (iv) failed to inform Plaintiffs, and those similarly situated, that the representations stated in (i), (ii), and (iii) above are false. This harmed Plaintiffs and Class members because they paid a price premium as a result.

166.  Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgment against Defendants as follows:

A.  Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.  An award of compensatory damages, including statutory damages, where available at law, to Plaintiffs and the Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including both pre- and post-judgment interest thereon;

C.  An order for full restitution;

D.  An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

E.  An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

F.  For reasonable attorneys' fees and the costs of suit incurred; and

G.  For such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: April 25, 2024                     **GUTRIDE SAFIER LLP**

*/s/Todd Kennedy/s/*
Seth A. Safier, Esq.
Todd Kennedy, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111