**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
 todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JYOTINDRA SHAKYA and THAN TRAN, on behalf of themselves, the general public, and those similarly situated,<br><br>                          Plaintiffs,<br><br>     v.<br><br>FANTASIA TRADING LLC and POWER MOBILE LIFE, LLC,<br><br>                          Defendants. | Case No. 3:23-cv-03925-JD<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT<br><br>Hearing Date:     June 20, 2024<br>Hearing Time:    10:00 A.M.<br><br>Hon. James Donato |

## I. INTRODUCTION

The Court previously dismissed Plaintiffs complaint because they "do not allege that the cameras in fact capture fewer pixels than their descriptions would suggest." ECF 56 at 4. But the Second Amended Complaint ("SAC") introduces two consumer surveys showing that consumers understand claims such as "4K," "2K," and "1080p" to refer to image *detail*, not just pixel count. SAC ¶¶ 1, 57–72. Indeed, one court in this district has allowed *identical* claims to proceed based on this exact understanding, and others have allowed similar claims to proceed.

For example, Judge Westmore recently denied a motion to dismiss for identical 1080p claims. *Starratt, et al. v. Immedia Semiconductor LLC, et al.*, No. 22-cv-04775-KAW, ECF 32 (N.D. Cal. Feb. 6, 2023). In *Staratt*, the plaintiffs alleged that defendants "falsely represented that the entire line of Blink home security cameras are '1080p' camera systems" but "the Blink cameras are 'incapable of providing video quality concomitant with 1080p resolution." *Id.* at 1. Judge Westmore allowed the claims to proceed because "[a]ccepting the[] allegations as true, there is no basis to believe that the Blink Cameras can ever reach 1080p resolution." *Id.* at 16. This is not an isolated case; other courts have allowed similar allegations to proceed past the pleading stage. *Howard v. DJI Tech., Inc.*, No. 2:16-CV-02292 LEK, 2017 U.S. Dist. LEXIS 154633 (E.D. Cal. Sep. 20, 2017) (drones incapable of providing "2.7K" and "4K" video detail) ; *Date v. Sony Elecs., Inc.*, No. 07-cv-592, ECF 22 (S.D. Cal. Apr. 2, 2007), *transferred to Date v. Sony Elecs., Inc.*, No. 07-15474 (E.D. Mich. Dec. 27, 2007) (televisions incapable of providing the represented "1080p" image detail).

Following this Court's previous decision, Plaintiffs engaged a survey expert to conduct two consumer surveys. The consumer surveys establish that consumers equate Defendant Fantasia Trading LLC and Defendant Power Mobile Life, LLC (collectively, "Defendants") "4K," "2K," and "1080p" representations to refer to image *detail*. One survey establishes, for example, that **90%** of reasonable consumers "believe that cameras advertised as having a higher resolution produce clearer video," and that **87%** of reasonable consumers believed "that cameras advertised as having a higher resolution produce more detailed video." *Id.* ¶ 59–61. In the

second survey, respondents overwhelmingly believed that a 1080p camera would have a higher resolution and image detail than a 720p camera. *Id.* ¶ 69. Given the clarified allegations of consumer understanding, Plaintiffs' complaint suffices to establish that Defendants' detail and definition claims are false and misleading because they advertise the Eufy Cameras as capable of "4K Ultra HD Detail," "4K Detail," and "4K" resolution (*id.* ¶¶ 33–35). As already established, expert testing shows that Defendants' so-called "4K" camera produces image detail at levels "***less than 2K resolution***" (*id.* ¶ 93), and that other Eufy Cameras—advertised as capable of "ultra-clear 2K resolution," "2K Ultra-HD details," and "2K" (*id.* ¶¶ 38–44)—have less than 720p image detail and resolution. (*Id.* ¶ 95.) In other words, Defendants' advertising leads consumers to believe they will receive image detail commensurate with the "4K" and "2K" claims, but the cameras' image detail is ***less than half*** of what consumers expect.

Despite these well-pleaded facts, Defendants invite the Court to determine ***as a matter of law*** that the two consumer surveys and expert testing cannot support Plaintiffs' plausible claims. The Court cannot do so at this stage. Moreover, whether consumers are likely to be misled and deceived is a question of fact. Governing law states that the Court can decide this issue as a matter of law only if it is "*impossible* for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Williams, v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (emphasis added). That is certainly not the case here based on Plaintiffs' allegations.

Finally, Defendant Power Mobile claims that it is not subject to personal jurisdiction. This argument fails because Plaintiffs allege that Power Mobile owns the Eufy Security App that consumers use to access their purportedly "4K," "2K," and "1080p" video and images from the Eufy Cameras. SAC ¶¶ 13–14. Moreover, Power Mobile fails to dispute any of Plaintiffs' allegations regarding its joint responsibility for the false and deceptive labeling, advertising, marketing, and sale of the Eufy Cameras. Indeed, California consumers can purchase the purportedly "4K," "2K," and "1080p" Eufy Cameras directly through the Eufy Security App, which Defendant Power Mobile owns and operates.

## II. BACKGROUND

### A. Procedural History

As the Court is aware, Plaintiffs allege that Defendants mislead consumers into believing that its "1080p," "2K," "4K," "HD," and "UHD" security cameras are able to provide the represented *image detail*. SAC ¶¶ 1–5, 30–56; ECF 56 at 1 (Plaintiffs allege that Defendants "misrepresented the resolution quality of their Eufy-brand security cameras to obtain a price premium."). Plaintiffs allege that consumers interpret the label claims to collectively mean that "they will be able to view video and *image detail* concomitant with the [] representation." *Id.* ¶¶ 36, 45, 48. Defendants "4K" cameras, however, provide less image detail than a 2K camera and the "2K" cameras provide less image detail than a 720p camera. *Id.* ¶¶ 57–72. As a result, Defendants' labels are false and misleading in violation of California law.

The Court previously dismissed Defendant Power Mobile under Federal Rule of Civil Procedure 12(b)(2). ECF 56 at 2. The Court held that the "complaint does not indicate what Power Mobile does or how it might be connected in any way to the cameras or marketing claims discussed in the complaint." *Id.* It further held that the complaint failed to include "particularized allegations about business activities purposefully directed at California." *Id.* The Court granted Plaintiffs leave to amend. *Id.* at 4.

The Court also dismissed all claims against Defendant Fantasia Trading under Rules 12(b)(6) and 9(b). *Id.* at 2–3. The Court found that "the complaint does not plausibly allege" that the devices Plaintiffs purchased fell short of the represented pixel count. *Id.* at 3. The Court reasoned that "video resolution and image quality are not the same thing" which "may be why [Plaintiffs'] own test results show variation in the quality and clarity of the images among the control group cameras." *Id.* The Court further reasoned that the image variability by Plaintiffs' expert may have been caused by "image degradation" as a result of "poor quality sensors," "camera internals," or "signal processing algorithms." *Id.* at 3–4. It granted Defendants' motion to dismiss and Plaintiffs leave to amend. *Id.* at 4.

**B.  The SAC Includes Two Surveys Confirming That Consumers Associate "1080p," "2K," and "4K" As Relating to Image Detail and Resolution.**

The SAC adds allegations about two consumer surveys conducted by an expert. SAC ¶¶ 57–72. They show how consumers interpret detail and definition claims. *Id.* ¶¶ 57, 63. Survey 1 surveyed 640 home security camera consumers and Survey 2 surveyed 790 home security camera consumers. *Id.* ¶ 58, 64. All respondents were "instructed to look at the advertisements as if they were shopping for a home security camera as they normally would (either online or in-store)." *Id.* Both allowed respondents to view the advertisements for as long as they needed. *Id.*

Survey 1 asked a series of questions to assess consumer understanding of "2K" claims as they appear on certain Eufy Cameras. SAC ¶ 59. After viewing a Eufy-branded security camera with a "2K" claim, respondents were asked, "Do you believe that the claim '2K' appearing in the advertising that you just reviewed refers to the resolution of the camera, or do you not believe that?" *Id.* An overwhelming majority of survey respondents, ***88%***, believe that the "2K" claim refers to resolution. *Id.* Respondents were then asked, "Do you believe that cameras advertised with a higher resolution produce clearer video than cameras advertised as having a lower resolution, or do you not believe that?" *Id.* ¶ 60. Again, a majority of survey respondents, ***90%***, believed that cameras advertised with higher resolutions produce clearer video. *Id.* Respondents were next asked whether they believed that "cameras advertised as having a higher resolution produce video with a higher level of detail than cameras advertised as having a lower resolution." *Id.* ¶ 61. A significant majority of survey respondents, ***87%***, believed "that cameras advertised as having a higher resolution produce more detailed video." *Id.* Finally, if there were any doubt left, ***89%***, believed that they "would better be able to recognize faces in video from cameras advertised as having a higher resolution." *Id.* In other words, reasonable consumers expect greater image detail from security cameras advertised as "2K."

Survey 2 was a comparative survey involving the claim "1080p" and "720p." SAC ¶ 63. Survey 2 presented two security camera advertisements to respondents and "[t]he only difference between Camera A and B were the representations regarding detail and definition": Camera A represented it produced "1080p HD video" and Camera B represented it produced

"720p HD video." *Id.* ¶¶ 65–66. "To assess consumer understanding about video and image detail claims, respondents were asked whether they believed Camera A would provide clearer pictures and video, whether Camera B would give clearer pictures and video, or whether both cameras provide pictures and video of the same detail and definition." *Id.* ¶ 67. A vast majority of respondents, **82%**, believed "that the 1080p security camera would provide clearer pictures and videos." *Id.* "In other words, reasonable consumers expect greater detail and definition from a 1080p security camera when compared to a 720p security camera." *Id.* Respondents were then asked whether the 1080p camera, 720p camera, or both would be equally easy to identify faces with. *Id.* ¶ 68. A majority of respondents, **76%**, believed that it "would be easier to identify faces using the 1080p security camera." *Id.* "That is, reasonable consumers shopping for security cameras would purchase a 1080p camera expecting superior levels of video and image detail when compared to a 720p camera." *Id.* Finally, respondents were asked whether a 1080p camera, 720p camera, or both cameras would have the same resolution. *Id.* ¶ 69. "Respondents overwhelmingly (**85%**) believed that the 1080p security camera would have a higher resolution." *Id.* "That is, with each step up in advertised detail and definition, reasonable consumers expect a corresponding increase in resolution." *Id.*

The survey results demonstrate that "reasonable consumers do not equate Defendants' detail and definition claims as relating to pixels because pixels alone do not determine video and image detail." *Id.* ¶ 71. "Reasonable consumers equate '1080p,' '2K,' '4K,' 'HD,' and 'UHD' claims as relating to the overall video and image detail and definition." *Id.*

### III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "When 'consumer survey data is incorporated into . . . [a complaint], . . . the Court must presume its truth' on a motion to dismiss, even if a defendant has raised colorable arguments as to the reliability of the survey methodology." *Shalikar v. Asahi Beer U.S.A.*, No. LA CV17-02713 JAK (JPRx), 2017 U.S. Dist. LEXIS 221388, at *18 (C.D. Cal. 2017) (alterations in

original, quotations omitted); *see McGinity v. P&G*, 69 F.4th 1093, 1099 (9th Cir. 2023) ("we accept the allegations concerning the survey as true at this stage of litigation"). "This rule arises from the well-established principle that any weighing of evidence is inappropriate on a 12(b)(6) motion." *Shalikar*, 2017 U.S. Dist. LEXIS 221388, at *18 (citing *Jones v. Johnson*, 781 F.2d 769, 722 n.1 (9th Cir. 1986)). Indeed, "plaintiffs are generally not expected to provide evidence in support of their claims at the pleading stage . . . nor are they required to plead the 'probability' of their entitlement to relief." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018). Instead, a claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). And the complaint need only "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

Plaintiffs' fraud-based, California consumer protection claims "are governed by the 'reasonable consumer' standard," under which Plaintiffs must adequately allege "that a significant portion" of consumers acting reasonably under the circumstances "are likely to be deceived" or confused by the claim at issue. *McGinity*, 69 F.4th at 1097; *see also Williams*, 552 F.3d at 938 (standard prohibits "'any capacity, likelihood or tendency to deceive or confuse the public'"). California law has long specified that whether "a practice is deceptive" under this standard is "a question of fact not appropriate for decision on" a motion to dismiss. *Salazar*, 83 Cal. App. 5th at 579; *accord Williams*, 552 F.3d at 938 (following "California courts" on this issue). "This is because what matters is how consumers actually behave—how they perceive advertising and how they make decisions. These are matters of fact, subject to proof that can be tested at trial, even if as judges we might be tempted to debate and speculate further about them." *Salazar*, 83 Cal. App. 5th at 579 (quotes omitted). "Thus, whether a reasonable consumer is likely to be deceived as a matter of law may be decided only in rare situations", *id.*, when it is "impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Williams*, 552 F.3d at 939.

## IV. ARGUMENT

### A. Dismissing the Second Amended Complaint Would Contradict The Denial of the Motion to Dismiss in *Starratt v. Immedia Semiconductor LLC.*

Defendants are not the first to overstate the capabilities of their cameras. Judge Westmore recently denied defendants' motion to dismiss for ***identical allegations*** in *Starratt*, No. 22-cv-04775-KAW, ECF 32. There, the "[p]laintiffs allege[d] that they were factually misled regarding the image quality provided by [defendants'] products", i.e., that the "Blink Cameras are not capable of providing 1080p resolution" despite defendants prominent and repeated "1080p" claims. *Id.* at 15. The plaintiffs alleged that the cameras overstated their "capabilities by at least 250%." *Id.* Like here, the plaintiffs supported their allegations with testing of the camera's image detail capability. *Starratt,* No. 22-cv-04775-KAW, ECF 1 ¶¶ 41–50. The plaintiffs further alleged that "they relied on the webpages' statements regarding 1080p image quality, and they were ultimately disappointed with the image quality the cameras provided." *Starratt,* No. 22-cv-04775-KAW, ECF 32 at 15. The court ultimately held that "because [p]laintiffs allege that the Blink cameras are incapable of meeting the factual and measurable '1080p' image standard . . ., the Court finds that [p]laintifs have pleaded that a reasonable consumer would be misled by Defendants' marketing statements." *Id.* at 17.

Other courts have reached similar conclusions. In *Howard v. DJI Tech.*, the plaintiff alleged that he purchased two drones, one which "prominently advertises the ability of the camera on the drone to capture '2.7K HD Video,'" and the second which "prominently advertises the ability of the camera on the drone to capture '4K HD Video.'" *Howard v. DJI Tech., Inc.*, No. 2:16-CV-02292 LEK, 2017 U.S. Dist. LEXIS 154633, at *2–3 (E.D. Cal. Sep. 20, 2017). The court allowed the UCL claims to proceed because the plaintiff alleged, he "has suffered a substantial injury because he paid valuable consideration for the Drones, which had higher prices because of the advertised HD recording features, but which did not have advertised features." *Id.* at *16. In *Date v. Sony Elecs., Inc.*, No. 07-cv-592, ECF 22 (S.D. Cal.), *transferred to Date v. Sony Elecs., Inc.*, No. 07-15474 (E.D. Mich.), the plaintiff alleged that "[d]efendants uniformly represented and overcharged Plaintiff and the Class members for

televisions having 1080p resolution, when such televisions could not perform as advertised and represented based on inherent limitations in this line of television sets." No. 07-cv-592, ECF 22 ¶ 33 (S.D. Cal. Jul. 2, 2007); *see id.* ¶¶ 19–28. The case was later transferred for convenience to the Eastern District of Michigan. *See Date*, No. 07-cv-592, ECF 48 (S.D. Cal. Dec. 17, 2007). Thereafter, the parties filed for final approval of a proposed class action settlement and the court found that "the instant Sony television sets . . . were not capable of accepting 1080p digital video input signals." *Date v. Sony Elecs., Inc.*, No. 07-15474, 2009 U.S. Dist. LEXIS 15837, at *4 (E.D. Mich. Feb. 20, 2009); *see id.* at *39 ("Sony misled consumers about a particular feature of the television set-1080p native resolution.").

Here, Plaintiffs go above and beyond the allegations in *Starratt*, *Howard*, and *Date* because they have included evidence from their survey expert and video image expert. SAC ¶¶ 57–72 (survey evidence); *id.* ¶¶ 73–95 (video image expert); *see also id.* ¶¶ 96–99 (Plaintiffs' counsel qualitative testing).

The Court previously held that Plaintiffs did not plausibly allege that their devices fell short of the represented "4K" and "2K" representations, but the Court's holding was based on the assumption that Defendants' advertising refers merely to ***pixel count***. ECF 56 at 3–4; *see id.* at 4 ("Plaintiffs . . . do not allege that the cameras in fact capture fewer pixels than their descriptions would suggest."). The new survey allegations show that the Court's assumption was incorrect. Specifically, the new allegations show that "reasonable consumers do not equate Defendants' detail and definition claims as relating to pixels because pixels alone do not determine video and image detail." SAC ¶ 71; *see id.* ¶¶ 57–72. **88%** of reasonable consumers understand one of Defendants' "2K" representations as referring to resolution. *Id.* ¶ 59. **90%** of reasonable consumers "believe that cameras advertised as having a higher resolution produce clearer video." *Id.* ¶ 60. And, **87%** of reasonable consumers "believe that cameras advertised as having a higher resolution produce more detailed video." *Id.* ¶ 61. The second comparative survey confirms the results. *Id.* ¶ 67 ("Respondents overwhelmingly (82%) believed that the 1080p security camera would provide clearer pictures and videos [compared to a 720p security

camera]."). "Reasonable consumers equate '1080p,' '2K,' '4K,' 'HD,' or 'UHD' claims as relating to the overall video and image detail and definition." *Id.* ¶ 71. "Defendants' own product listing for the S200 eufyCam confirms this understanding [as] [i]t purports to contrast a 1080p and a 720p image to show consumers the purported superiority of the 1080p camera. The product listing shows a clearly inferior 720p image with poor detail and definition. Thus, Defendants understand that consumers equate '1080p,' '2K,' '4K,' 'HD,' or 'UHD' claims to higher video and image detail." *Id.* ¶ 72.

Defendants argue that Plaintiffs' SAC is somehow inconsistent with their prior complaint. ECF 61 at 8. There is no inconsistency. As this Court previously acknowledged, Plaintiffs allege that Defendants "misrepresented the resolution quality of their Eufy-brand security cameras to obtain a price premium." ECF 56 at 1. The SAC merely adds survey evidence regarding consumer understanding of the detail and definition claims. SAC ¶¶ 57–72. The consumer surveys rebut any assertion that the detail and definition claims refer to pixels alone because consumers overwhelmingly believe that "2K" refers to overall resolution and that the higher resolution security cameras produce greater image detail. *See id.*

Defendants next take issue with "the methodology of the surveys . . . [because] Plaintiffs provide little to demonstrate the validity or reliability of their methods." ECF 61 at 9. This type of argument is entirely inappropriate at the motion to dismiss stage. "When consumer survey data is incorporated into [a complaint], . . . the Court must presume its truth on a motion to dismiss, even if a defendant has raised colorable arguments as to the reliability of the survey methodology." *Shalikar*, 2017 U.S. Dist. LEXIS 221388, at *18 (alterations in original, quotations omitted); *Nacarino v. Chobani, LLC*, No. 20-cv-07437-EMC, 2021 U.S. Dist. LEXIS 149153, at *24 n.3 (N.D. Cal. 2021) ("Chobani argues that the survey's ostensibly flawed methodology (e.g., its leading questions, poor presentation of answer choices, and lack of control group) should lead the Court to discount it. . . . However, evaluating the quality of a plaintiff's evidence is inappropriate at this stage of the litigation."); *see also Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1280 (C.D. Cal. 2016) ("[a]s a general rule, parties

can't present (and courts can't consider) evidence outside of the complaint when deciding a Rule 12(b)(6) motion to dismiss."). This is especially true for fact-based inquiries such as "[c]onsumer decision-making" which "requires an analysis of factual matters." *Tortilla Factory, LLC v. Humm Kombucha, LLC*, No. LA CV17-09092 JAK (AFMx), 2018 U.S. Dist. LEXIS 246646, at *11 (C.D. Cal. 2018). Plaintiffs allege that respondents based their answers on a "2K" advertisement on a Eufy-branded security camera (SAC ¶ 59) and comparative advertisements of a 1080p and 720p security camera (*id.* ¶ 65). At this stage, the Court must accept these allegations as true and cannot entertain Defendants' speculation.

Defendants argue that "Plaintiffs themselves have admitted . . . that a '2K' camera is one that is capable of recording an image with 3,686,400 distinct pixels and a '4K' camera is one that is capable of recording an image with 8,294,400 distinct pixels." ECF 61 at 9–10 (citing FAC). But as Defendant acknowledges and fails to rebut, plaintiff's new allegations establish that when "consumers 'see security cameras advertised as being '1080p,' '2K,' and '4K,' they reasonably expect ***not only the correct pixel count, but also the corresponding amount of image detail***." *Id.* at 9 (citing SAC ¶ 1) (emphasis added); *see also id.* ¶¶ 57–72. Thus, Defendants' various arguments about Plaintiffs' purported admissions is misguided.

Defendants also argue that "none of the claimed survey results purport to show that there is any 'corresponding amount of image detail' to the labels '1080p,' '2K,' and '4K.'" ECF 61 at 10. But the surveys show that consumers expect greater image detail and definition when exposed to detail and definition claims. SAC ¶¶ 57–72. Moreover, Plaintiffs' expert Dr. Castleman establishes that Defendants' "4K" cameras provide less image detail and a lower resolution ***than a 2K camera***. *Id.* ¶ 93. Dr. Castleman also shows that the "2K" cameras provide less image detail and a lower resolution ***than a 720p camera***. *Id.* ¶ 95. These are no small misrepresentations; consumers are getting less than ***50%*** of the image detail that they expect when they see Defendants' advertising. As such, the purported "unspecified amount of higher detail" can and has been measured by Plaintiffs' expert. *Id.* ¶ 2 ("Image detail is an object aspect of video quality; it can be measured. And in this case, it ***was*** measured.").

Defendants next claim that "the SAC does not even attempt to specify what that level of detail would be" commensurate with the "4K," "2K," and "1080p" representations. ECF 61 at 10. But Dr. Castleman's testing does exactly that. He compared the "4K" and "2K" Eufy Cameras' "images to that of three reference cameras" which are variously capable of 3456 x 4608 resolution, 3024 x 4032 resolution, and 1920 x 1080 resolution. SAC ¶ 75.[1] Dr. Castleman then generated the MTF for each camera "which allows for more accurate testing of the video and image detail because it measures resolution, sensor quality, processing algorithms, and electronic circuitry, and lens quality." *Id.* ¶ 77. The "MTFs confirm . . . the video and image detail of the Eufy Cameras is markedly inferior to those of the reference cameras." *Id.* ¶ 89. Further testing by Dr. Castleman shows "the true resolution of the eufyCam 3C—advertised as being 4K camera—is . . . slightly less than 2K resolution." *Id.* ¶ 93. Dr. Castleman also shows that the Video Doorbell E340—advertised as being a 2K camera—is 720p or less in actual resolution. *Id.* ¶ 95.

**B.    The Court Has Specific Jurisdiction over Defendant Power Mobile.**

"When a plaintiff relies on specific jurisdiction, he must establish that jurisdiction is proper for 'each claim asserted against a defendant.'" *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015). (citing *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)). "If personal jurisdiction exists over one claim, but not others, the district court may exercise pendent personal jurisdiction over any remaining claims that arise out of the same 'common nucleus of operative facts' as the claim for which jurisdiction exists." *Id.*

"There are three requirements for a court to exercise specific jurisdiction over a nonresident defendant: (1) the defendant must either purposefully direct his activities toward the forum or purposefully avail[ ] himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it

---

[1] Although this Court previously found that Dr. Castleman's testing showed variation, Dr. Castleman "controlled for other parameters which can affect detail and definition, such as image noise, color, and lens distortion." SAC ¶ 76.

must be reasonable." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). The plaintiff bears the burden of proving the first two prongs, and, upon a successful showing, the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would be unreasonable. *Id.* at 1211–12.

"Courts have held that product false-labeling and breach-of-warranty claims sound primarily in tort and thus apply a purposeful-direction analysis." *Kellman v. WFM Private Label, L.P.*, No. 17-cv-06584-LB, 2019 U.S. Dist. LEXIS 55979, at *13 (N.D. Cal. Mar. 29, 2019). Purposeful direction "exists when a defendant commits an act outside the forum that was intended to and does in fact cause injury within the forum." *Calder v. Jones*, 465 U.S. 793, 788–789 (1984). Under the "effects" test, the defendant must (1) commit an intentional act (2) expressly aimed at the forum (3) that causes harm that the defendant knows is likely to be suffered in the forum. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 (9th Cir. 2011). The "'effects' test focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Id.* The operation of "a passive website" alone is not enough, "something more" must be shown. *Id.*

This Court previously held that the "complaint says only that Power Mobile is 'a limited liability company' . . . [and] does not indicate what Power Mobile does or how it might be connected in any way to the cameras or marketing claims discussed in the complaint." ECF 56 at 2. The SAC cures those deficiencies contrary to Defendants' assertions.  ECF 61 at 6. Plaintiffs allege that "Fantasia and Power Mobile are jointly responsible for the conduct alleged herein, including without limitation, the false and deceptive labeling, advertising, marketing, and sale of the Eufy Cameras." SAC ¶ 12; *see id.* ¶¶ 16–20. "Indeed, the smart phone application that is used to operate the Eufy Cameras, Eufy Security, is listed on the Apple App Store as belonging to Defendant Power Mobile Life." *Id.* ¶ 13. Defendants instruct users to download the Eufy Security App on the product labeling, packaging, and instruction manuals included with every Eufy Camera because it "allows consumers to access their purportedly '1080p,' '2K,' '4K,' 'HD,' 'UHD' video and images." *Id.* ¶ 14; *see id.* ¶ 55 ("Defendants

1  provide [] third-party retailers with specifications and advertising materials"). Thus, without
2  Defendant Power Mobile and its Eufy Security App, Defendant Fantasia would be unable to
3  claim that it can provide purportedly "4K," "2K," and "1080p" image detail through its
4  smartphone applications on its labeling, packaging, and marketing materials. This is enough to
5  confer specific jurisdiction.

6  Defendant Power Mobile takes further action within the Eufy Security App for a finding
7  of "something more" under the "effects" test. For example, the labels, packaging, and
8  instruction manuals for the Eufy Cameras specifically instruct all consumers to download the
9  Eufy Security App, including the Eufy Cameras sold through retailers such as Best Buy, Home
10 Depot, and Walmart in California. SAC ¶¶ 13–14, 55–56. Defendant Power Mobile's privacy
11 policy for the Eufy Security App states that it uses California consumers' geolocation data for
12 targeted advertising, this includes targeted advertising for Eufy Cameras that make "4K," "2K,"
13 and "1080p" representations. Defendant Power Mobile also sells the Eufy Cameras through the
14 Eufy Security App. Courts have held this is sufficient. *See, e.g., Herbal Brands, Inc. v.*
15 *Photoplaza, Inc.*, 72 F.4th 1085 (9th Cir. 2023) ("We hold that, if a defendant, in its regular
16 course of business, sells a physical product via an interactive website and causes that product to
17 be delivered to the forum, the defendant has purposefully directed its conduct at the forum such
18 that the exercise of personal jurisdiction may be appropriate."); *Mavrix*, 647 F.3d at 1229
19 ("where, as here, a website with national viewership and scope appeals to, and profits from, an
20 audience in a particular state, the site's operators can be said to have 'expressly aimed' at that
21 state."); *Kauffman v. Papa John's Int'l, Inc.*, 2024 U.S. Dist. LEXIS 7873, *9–10 (Assertions
22 that defendant benefits from marketing and doing business in California through its interactive
23 website "sufficiently allege[s] that Defendant operates an interactive website which is integrated
24 with retail outlets in California, therefore [defendant] is carrying on part of its general business
25 in California by marshaling the market via its website. This satisfies the 'something more'
26 requirement to demonstrate that Defendant 'expressly aimed' its conduct at California.").

Defendant Power Mobile knew that the alleged harm was likely to be suffered in California. There is no dispute that Defendants represent that the Eufy Security App can be used to access the purportedly "4K," "2K," and "1080p" video and images. Additionally, the "4K," "2K," and "1080p" representations were made to California residents on the labeling, packaging, and marketing through third party retailers (such as Best Buy, Home Depot, and Walmart), Defendants' Eufy website, and Defendant Power Mobile's Eufy Security App. SAC ¶¶ 12, 18, 20, 50, 55; *Thomas v. Papa Johns Int'l, Inc.*, No. 22cv2012 DMS (MSB), 2023 U.S. Dist. LEXIS 179279, at *11–12 (S.D. Cal. Aug. 14, 2023) ("there is no dispute Defendant's website is accessible to California residents, and that California residents order and receive Defendant's products in California through Defendant's website.").

Finally, returning to the broader test for specific jurisdiction, Defendant Power Mobile's activities "arise out of or relate to" Plaintiffs' claims. "Claims 'arise out of' the defendant's contacts with the forum state when there is a causal connection between the contacts and the claims." *In re McKinsey*, 637 F. Supp. 3d 773, 787 (N.D. Cal. 2022) (citing *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1026 (2021)). "While there is no precise test for determining whether a plaintiff's claims 'relate to' a defendants' contacts, the U.S. Supreme Court has held that 'some relationships will support jurisdiction without a causal showing.'" *Id.*

Here, Plaintiffs' claims **both** "arise out of" and "relate to" the "4K," "2K," and "1080p" video and image detail representations. SAC ¶¶ 30–56. As outlined above, Plaintiffs' claims "arise out of" Defendant Power Mobile's contacts with the forum because it, along with Defendant Fantasia, represented that Plaintiffs' could access the purportedly "4K," "2K," and "1080p" video and images from the Eufy Cameras on the Eufy Security App. *Id.* ¶¶ 13–14; *see id.* ¶ 55 ("Defendants provide these third-party retailers with specifications and advertising materials"). Plaintiffs' claims also "relate to" Defendant Power Mobile's contacts with California because Defendant Power Mobile's Eufy Security App does not provide consumers with "4K," "2K," and "1080p" levels of image detail as represented. *Ford*, 141 S. Ct. at 1027 ("this Court has stated that specific jurisdiction attaches in cases . . . when a company . . . serves


a market for a product in the forum State and the product malfunctions."); *see id.* ("[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in [several or all] other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."); *Thomas*, 2023 U.S. Dist. LEXIS 179279, at *12. As such, Plaintiffs have made the requisite showing "of jurisdictional facts to withstand the motion to dismiss." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants Motion to Dismiss.

///

Dated: May 23, 2024

**GUTRIDE SAFIER LLP**

 */s/ Seth A. Safier /*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*